**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DISH NETWORK L.L.C., a Colorado Limited Liability Company,
ECHOSTAR TECHNOLOGIES, L.L.C., A Texas Limited Liability Company, and
NAGRASTAR L.L.C., a Colorado Limited Liability Company,

Plaintiffs,

vs. Case No. 3:09-cv-532-J-32JRK

TAB WHITEHEAD d/b/a www.fta4bus.com a/k/a www.fta4biz.com and d/b/a www.fta4world.com and d/b/a www.nag3iks.com,

Defendant.

---

**ORDER**

This case is before the Court on Plaintiffs' Motion for Summary Judgment (Doc. 86), to which pro se Defendant Tab Whitehead ("Whitehead") has filed a response (Doc. 88). Plaintiffs move for summary judgment on Counts I and III of their Amended Complaint, which allege violations of the Digital Millennium Copyright Act ("DMCA") and the Communications Act. For the reasons stated below, Plaintiffs' Motion is due to be granted.

## I. Background

### A. Plaintiffs' Subscription-Based Satellite TV Programming

Plaintiffs DISH Network L.L.C. ("DISH Network"), EchoStar Technologies L.L.C. ("EchoStar Technologies"), and NagraStar L.L.C. ("NagraStar") operate various elements of the DISH Network satellite television distribution system. DISH Network is a multi-channel

provider that delivers video, audio, and data services via a direct broadcast satellite system to more than 13 million subscribers throughout the United States, Puerto Rico and the U.S. Virgin Islands. EchoStar Technologies designs, develops, and distributes receiver systems, satellite dishes, and other digital equipment for use in the DISH Network system. NagraStar provides DISH Network with "smart cards" that are used in EchoStar Technologies' satellite receivers to facilitate the decryption of DISH Network's programming signals.

DISH Network uses high-powered satellites to broadcast, among other things, movies, sports, and general entertainment services to consumers who have been authorized to receive such services after payment of a subscription fee, or in the case of a pay-per-view movie or event, the purchase price. DISH Network contracts for and purchases the distribution rights for the copyrighted programming it broadcasts from outlets such as network affiliates, cable networks, motion picture distributors, sports leagues, event promoters, and other holders of programming rights. DISH Network then digitally encodes and scrambles the broadcast signals utilizing NagraStar's encryption technology, and delivers the scrambled signals via satellite to the EchoStar Technology dishes and receivers owned or leased by authorized subscribers.

The Plaintiffs' encryption system is designed to restrict access to their signals such that only those authorized subscribers can decrypt the signals for which they pay. (See Doc. 86-3, Declaration of Scott Anderson ("Anderson Dec.") ¶ 18.) To effectuate this decryption system, the Plaintiffs utilize smart cards which carry certain NagraStar encryption technology and the authorizations associated with a particular subscriber. (Id. ¶¶ 20-21.) The DISH Network smart cards and their associated technology are fundamental to the DISH Network

security system in that they prevent unauthorized program viewing while simultaneously permitting authorized receivers used by legitimate subscribers to descramble the signals and obtain programming in accordance with the subscriber's subscription package or pay-per-view purchase. (Id. ¶ 24.)

**B. Piracy of DISH Network Programming Using Free-To-Air Receivers**

Satellite "pirates" have developed several means of circumventing the DISH Network security system and intercepting DISH Network satellite broadcasts using Free To Air ("FTA") satellite receivers.[1] In one such "work-around," the pirates created software which was programmed onto the FTA receiver so as to mimic a DISH Network smart card.[2] Once the FTA receivers were programmed with the card-hack software, the "modified" receiver could decrypt DISH Network's signals without authorization. The encryption system utilized by Plaintiffs until June of 2009, which pirates referred to as "Nagra 2," was susceptible to this form of piracy.[3] (Id. ¶¶ 27-40.)

In addition to the card-hack, pirates recently developed a new method of obtaining DISH Network's signals without authorization: Internet Key Sharing (IKS). IKS utilizes

---

[1] FTA satellite receivers were originally designed to receive free satellite television channels which carry unencrypted programming. FTA satellite broadcasts are mostly limited to ethnic, religious, business, music, information, or advertising content, rather than the more sought-after content offered by subscription-based satellite providers such as DISH Network.

[2] This work-around was referred to as a "card-hack."

[3] In June 2009, Plaintiffs switched to a new encryption system, which pirates refer to as "Nagra 3." The new system does not appear to have been "card-hacked," meaning that as of June 2009, Nagra 2 card-hack piracy appears to have come to an end. (Anderson Dec. ¶¶ 40-41.)

internet-enabled FTA receivers. (Id. ¶ 42.) In IKS piracy, the decoding keys which effectuate the decryption of DISH Network's signals are captured from legitimate accounts that certain pirates maintain or have access to. The pirates then place the decoding keys on a server connected to the internet. The servers allow the decoding keys to be shared over the internet such that internet-enabled FTA receivers programmed with modified FTA/IKS piracy software can utilize these decoding keys to decrypt DISH Network's signals without authorization. (Id. ¶ 45.)

### C. Record Evidence of Whitehead's Distribution of Piracy Software

Plaintiffs, on the suspicion that Whitehead was involved in piracy of DISH Network signals, began an investigation into his activities in the summer of 2008. (Doc. 8, Declaration of Michael Jaczewski ("Jaczewski Dec.") ¶ 14.) In September of 2008, Whitehead sold an FTA receiver to an undercover investigator and subsequently directed the investigator to known piracy websites which would provide the software "support" necessary to modify the FTA receiver so as to effectuate the unauthorized interception of DISH Network signals. (Id. ¶¶ 18-21.) After a number of unsuccessful attempts, the investigator—with Whitehead's assistance—ultimately downloaded the necessary software to obtain DISH Network programming without authorization from the website www.fta4world.com, which Whitehead advised was "his own site." (Id. ¶¶ 22-23.)[4]

---

[4] After additional telephone and email conversations with Whitehead, the investigator also purchased additional equipment (and a monthly subscription) from www.fta4world.com which would allow the FTA receiver to connect to the internet so as to obtain a continuous stream of decryption codes, rendering ineffective certain electronic countermeasures utilized by Plaintiffs to combat card-hack piracy. (Id. ¶¶ 24-29.)

At all times pertinent to the Complaint, Whitehead was the registrant of and the listed administrator/contact person for the internet sites www.fta4world.com and www.nag3iks.com (the "subject websites"). (Jaczewski Dec. ¶ 15; Anderson Dec. ¶¶ 60-61.)[5] The subject websites offered hundreds of software files for downloading which were designated or described as DISH Network piracy software files, including software files for many makes and models of FTA receivers and internet-enabled FTA receivers. (Doc. 86-4, Declaration of Daniel McMullen ("McMullen Dec.") ¶¶ 9-10.) Terms on the subject websites provided that access to the software downloads was available for a fee of $10.00 per month (Anderson Dec. ¶ 70). In addition, both websites contained language whereby Whitehead attempted to disclaim any liability pertaining to the distribution of piracy software files. (Id.)[6]

In analyzing the software files offered for downloading and actually downloaded from the subject websites, Plaintiffs' software expert limited his analysis to those particular files which he had "previously examined and unequivocally determined to be DISH Network

[5] Over the course of this case, Whitehead has made numerous statements admitting an ownership interest in and some control over the subject websites. (See Doc. 66 at 3; see also Doc. 43 at 3.) In his "Counter Complaint," Whitehead admitted that he had at least fifty percent ownership of the sites and had certain authority regarding their operations, though he claimed that his control was "limited." (Doc. 43 at 3.) Specifically, he contends that while he owned the domain names, he "did not have master admin. authority" of the sites. (Id., see also Doc. 88 at 3).

[6] See Counter Complaint at 4 ("Upon entering said sites it clearly states as a condition of use that members are not to break any laws with info gained from said sites and all info is for educational purposes only. Furthermore its [sic] clearly stated each member is responsible for abiding by the laws as to satellite reception and piracy as it pertains to the site member as a condition of use . . . .").

piracy software files." (McMullen Dec. ¶ 11.)[7] The website www.fta4world.com offered 29 previously identified DISH piracy software files for downloading, 19 of which were modified FTA Nagra 2 card-hack piracy software files and 10 of which were modified FTA/IKS piracy software files. These files were downloaded from the website to third parties on 11 occasions. (Id. ¶ 12). The website www.nag3iks.com offered 23 previously identified DISH Network piracy software files for downloading, 8 of which were modified FTA Nagra 2 card-hack piracy software files and 15 of which were modified FTA/IKS piracy software files. These files were downloaded from the website to third parties on 4 occasions. (Id. ¶ 13). Plaintiffs presented testimony that each of the downloaded files were primarily of use in the unauthorized interception of DISH Network signals, were designed or produced for the purpose of circumventing the Plaintiffs' digital encryption, and had little or no practical use other than for piracy. (Id. ¶ 14.) In fact, Plaintiffs' software expert opined that the files offered for download on the subject website were designed solely to program hardware such that the modified hardware could decrypt DISH Network's signals without authorization, and had "*no* other commercially significant purpose or use . . . unrelated to piracy." (Id. ¶ 15) (emphasis in original).

---

[7] Plaintiffs' software expert defined "DISH Network piracy software files" as "modified FTA Nagra 2 card-hack piracy software files and modified FTA/IKS piracy software files" which could be used with certain FTA receivers and internet-enabled FTA receivers to decrypt DISH Network programming without authorization. (Id. ¶¶ 7-8.)

## II. Discussion

### A. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment." Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)). The moving party bears the initial burden of showing, by reference to materials on file, that there is no genuine issue of material fact for trial. Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995). "When a moving party has discharged its burden, the nonmoving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Id. (quoting Celotex Corp. v. Cattret, 477 U.S. 317 (1986)). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

### B. The Communications Act

Plaintiffs argue that Whitehead's distribution of DISH Network piracy software files via the subject websites violates the Communications Act, 47 U.S.C. § 605(e)(4). That section

provides that it shall be a violation of the statute where any person:

> who manufactures, assembles, modifies, imports, exports, sells, or distributes *any electronic, mechanical, or other device or equipment*, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, *or is intended for any other activity prohibited by subsection (a) of this section*…

Id. (emphasis added). Subsection (a) of § 605 prohibits persons from receiving *or assisting in receiving*, without authorization, subscription-based satellite television programming such as DISH Network. Id. §605(a).[8] Plaintiffs contend that the DISH Network piracy software files downloaded from the subject websites are "devices" or "equipment" primarily of assistance in the decryption of DISH Network's signals.[9]

A recent case in the Orlando division of this Court found a similar distribution of DISH Network piracy software files violative of § 605(e)(4). See DISH Network L.L.C. et al. v Ward, Case No. 8:08-cv-590-T-30TBM (M.D. Fla. Jan. 8, 2010). In Ward, the defendant posted DISH Network piracy software files on websites from which the files were subsequently downloaded by third parties. This Court found that § 605(e)(4) applied to

---

[8] Section 605(a) proscribes the unauthorized use of interstate radio signals. In pertinent part it provides: "No person not being entitled thereto shall receive or *assist in receiving* any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto…" Id. (emphasis added). Courts, including this Court, have recognized that descrambling encrypted satellite television signals is within the purview of § 605(a). See Directv, Inc. v. Spokish, 2004 WL 741369 at *3 (M.D. Fla. Feb. 19, 2004); DirecTV, Inc. v. Robson, 420 F.3d 532, 537 (5th Cir. 2005); DIRECTV, Inc. v. Price, 403 F.Supp.2d 537, 542-43 (M.D. La. 2005).

[9] The Plaintiffs need not prove actual interception of its signals to prove a violation of § 605(e)(4). See Robson, 420 F.3d at 545.

software files because the plain meanings of the terms "device" and "equipment" included software. Id. at 13. As a result, the Court concluded that Ward, by making the files available electronically to third parties, was knowingly distributing devices that were primarily of assistance in the unauthorized interception of DISH Network's signals. Id. at 14.[10]

Whitehead does not dispute that the files available on the subject websites were DISH network piracy software files (i.e., software primarily of assistance in the unauthorized interception of DISH Network's signals) or that those piracy files were downloaded by third parties for the purpose of achieving unauthorized access to DISH Network programming. However, Whitehead denies "offering the piracy files to the public for distribution."[11] More specifically, Whitehead contends that despite being the registrant and listed administrator of the subject websites where the piracy files were made available for third-party download, *he* did not distribute the piracy files because he did not "control" the sites.

Whitehead's sole support for the contention that individuals other than himself were responsible for the distribution of piracy files from his websites comes in the form of two emails, dated March 10, 2009 and March 23, 2009. (Doc. 88, Appx. A & B.) According to Whitehead, the emails establish that another individual named "Jeff AKA ('stupit')" actually owned the vBulletin License and had administrative control of the subject websites. (Id. at 2-3.) However, contrary to Whitehead's assertions, the two emails only provide *further*

---

[10] Ward did not dispute that posting piracy software on websites constituted "distribution" under §605(e)(4). Rather, he contended that §605(e)(4) did not cover the distribution of piracy software, a contention that this Court rejected. Id. at 12-14.

[11] Plaintiffs have not presented evidence (and do not contend) that Whitehead wrote the piracy software, or that he was the person who actually posted it to the subject websites.

evidence of Whitehead's involvement with and operation of the subject websites. At most, the emails indicate that Whitehead attempted to "sell" his illicit "businesses" to another individual in March of 2009.[12] And despite this purported transfer of ownership, Whitehead does not dispute that the subject websites, which he acknowledges provided piracy files for download, remained registered to him at all times pertinent to this action. Further, Whitehead acknowledges using disclaimers on the subject websites in an attempt to shield himself from liability for distribution of the piracy software. See Counter Complaint at 4. This admission only serves to underscore both Whitehead's control over the subject websites and his knowledge of the illegality of his business. See Comcast of Illinois, LLC v. TKA Electronics, Inc., 2005 WL 2170092, *6 (D. Neb. 2005).

This Court, in Ward, found that posting piracy files to a piracy website was distribution within the meaning of § 605(e)(4). The record evidence in this case is that Whitehead owned websites which offered DISH Network piracy software files for download and that third parties actually downloaded such files from his websites on at least 15 occasions. The Court thus finds that Whitehead has failed to rebut Plaintiffs' evidence that he distributed piracy devices (i.e., software primarily of assistance in the unauthorized interception of DISH Network's signals) from the subject websites. As was the case in Ward, Whitehead's "denials and suppositions regarding other people who could have posted the offending files [are] insufficient to create a genuine issue of material fact for trial." Ward, Case No.

---

[12] Notably, the emails are dated at least six months after Whitehead directed an undercover investigator to www.fta4world.com, which he called "his site," to obtain piracy software. (See Jaczewski Dec. ¶¶ 22-23.)

8:08-cv-590-T-30TBM at 11; Jeffery, 64 F.3d at 593-94. Accordingly, Plaintiffs' Motion for Summary Judgment as to Count III of the Complaint is GRANTED.

**C. The Digital Millenium Copyright Act**

Plaintiffs also contend that Whitehead's distribution of piracy software violates the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(2). The DMCA prohibits persons from providing or offering to the public any technology that satisfies one of three criteria: (1) the technology is designed or produced for circumventing a measure that controls access to a copyrighted work; (2) the technology has only a limited commercial purpose or use other than for circumventing an access control measure; or (3) the technology is marketed for use in circumventing an access control measure. Id. For purposes of the statute, circumventing an access control measure means to "descramble a scrambled work, to decrypt an encrypted work, or to otherwise avoid, bypass, remove, deactivate, or impair a technological measure." Id. §1201(a)(3)(A). In light of these statutory provisions numerous courts, including this Court, have found that trafficking in satellite television decryption devices violates the DMCA. See Ward, Case No. 8:08-cv-590-T-30TBM at 11, DIRECTV, Inc. v. Little, 2004 WL 1811153, *6 (N.D. Calf. 2004); Comcast of Illinois X, LLC v. Hightech Electronics, Inc., 2004 WL 1718522, *6 (N. D. Ill. 2004).

As set forth above, the record reflects that the DISH Network security system is an access control measure under the DMCA. Cf. Ward, Case No. 8:08-cv-590-T-30TBM at 11. The record also reflects that Whitehead engaged in the internet-based distribution of software that enabled FTA receivers to circumvent the DISH Network security system. Cf. id. Lastly, the record reflects that the DISH Network piracy software files distributed by

Whitehead had no other commercially significant purpose or use but to circumvent the DISH Network security system. Accordingly, Plaintiffs' Motion for Summary Judgment as to Count I of the Complaint is GRANTED.

**D. Damages**

Plaintiffs seek statutory damages, injunctive relief, and a permanent seizure of certain assets for Whitehead's violations of the Communications Act and the DMCA. The Communications Act authorizes a prevailing plaintiff to recover statutory damages for "each violation" of section 605(e)(4) "in a sum not less than $10,000, or more than $100,000, as the court considers just." 47 U.S.C. § 605(e)(3)(C)(i)(II). Section 605(e)(4) is violated by each distribution of a piracy device. See id. § 605(e)(4) ("For purposes of all penalties and remedies established for violations of this paragraph, the prohibited activity . . . as it applies to each such device shall be deemed a separate violation."); Adkins, 320 F. Supp. 2d at 477 (section 605(e)(4) "deems the selling or distributing of each device to be a separate violation.") Statutory damages for Whitehead's violations of the Communications Act, using the minimum of $10,000 per file distributed, would total $150,000 (15 X $10,000).[13]

---

[13] Despite this, Plaintiffs seek less than the minimum statutory damage award available under the Communications Act. Specifically, Plaintiffs "are seeking statutory damages as to *five* violations of 47 U.S.C. § 605(e)(4), $50,000, in accordance with the Plaintiffs' third cause of action set forth in the Complaint. If the Court grants such a statutory damage award, the injunctive relief, and permanent seizure order referenced above, the Plaintiffs would waive all other claims they have against the Defendant, including the claims related to costs and attorneys fees, and the Plaintiffs would accept a final judgment against the Defendant based upon the Court's order for Summary Judgment. The Plaintiffs are willing to accept such a smaller award of statutory damages as it will still grant them some semblance of restitution and act as a considerable deterrent to this particular Defendant." (Doc. 86 at 3)(emphasis in original).

Likewise, the DMCA provides for "statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just." 17 U.S.C. §1203(c)(3)(A). Like the Communications Act, the DMCA makes clear that Plaintiffs are entitled to statutory damages for "each violation." In Stockwire Research Group, Inc. v. Lebed, the court held that "each violation" was to be determined on a per download basis. 577 F. Supp. 2d 1262, 1268 (S.D. Fla. 2008). Statutory damages for Whitehead's violations of the DMCA, using the minimum of $200 per file distributed, would total $3,000 (15 X $200).

"The law is clear that a plaintiff cannot recover duplicative statutory damages under different legal theories where the conduct underlying the claims is the same and DISH Network elects to recover under only one statute." Ward, Case No. 8:08-cv-590-T-30TBM at 14. In Ward, this Court concluded that recovery under the DMCA was more appropriate because the facts of the case were more relevant to that statute. Despite Plaintiffs' apparent preference to recover under the Communications Act, the Court sees no reason to deviate from the rationale in Ward given the similar facts of this case. In addition, as in Ward, the Court finds that an award of the minimum statutory damages amount is just, given Whitehead's indigence. Accordingly, Plaintiffs are entitled to statutory damages for Whitehead's violations of the DMCA, using the minimum of $200 per file distributed, in the amount of $3,000.

Section 1203(b)(1) of the DMCA and Section § 605(e)(3) of the Communications Act authorize courts to grant permanent injunctions to prevent or restrain violations. Whitehead consents to the entry of a permanent injunction. (Doc. 88 at 8.) The Court concludes that

Plaintiffs are entitled to such an injunction to prevent Whitehead from engaging in future wrongful conduct because Plaintiffs lack an adequate remedy to prevent damage they would suffer by Whitehead's continued activities.

Lastly, Plaintiffs request permanent seizure of all items recovered from Whitehead's residence pursuant to the Marshal's execution of the Writ of Seizure (see Doc. 21.) Whitehead consents to the Plaintiffs' permanent possession of all property seized. (Doc. 88 at 8.) The Court finds that vesting permanent possession in Plaintiffs appropriate pursuant to § 1203(b)(2) of the DMCA. Accordingly, it is hereby

**ORDERED:**

1. Plaintiffs' Motion for Summary Judgment (Doc. 86) as to Counts I and III is **GRANTED.** The remaining counts of the Complaint (Doc. 2) are **DISMISSED WITH PREJUDICE.** Plaintiffs' Motion to Strike (Doc. 89) is terminated as moot.

2. The Clerk is directed to enter judgment in favor of Plaintiffs, DISH NETWORK L.L.C., a Colorado Limited Liability Company, ECHOSTAR TECHNOLOGIES, L.L.C., aTexas Limited Liability Company, and NAGRASTAR L.L.C., a Colorado Limited Liability Company, and against Defendant, TAB WHITEHEAD, in the amount of $3,000, with post-judgment interest to accrue at the rate provided by 26 U.S.C. § 1961.

3. Defendant Tab Whitehead is **PERMANENTLY ENJOINED** from creating or distributing any form of technology that is designed for, primarily used for, or marketed for circumventing the DISH Network security system, or any technology otherwise of assistance in intercepting DISH Network programming. Further, Defendant Tab Whitehead is

**PERMANENTLY ENJOINED** from engaging in any form of circumvention or interception with respect to DISH Network's security system or satellite signal, or assisting any other person in same. Further, Defendant Tab Whitehead is **PERMANENTLY ENJOINED** from owning or operating the websites www.fta4world.com and www.nag3iks.com or any other website in any manner such that the operation would violate other terms of the injunctive relief set forth herein, including, but not limited to, distributing any type of DISH Network piracy software or piracy devices.

4. Plaintiffs shall have permanent possession and title to all items seized pursuant to this Court's Writ of Seizure (Doc. 21.)

5. The Court retains jurisdiction over this matter for the limited purpose of enforcing this order and permanent injunction. In the interim, the Clerk should close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 12th day of December, 2011.

TIMOTHY J. CORRIGAN
United States District Judge

jmm.

Copies:
counsel of record
pro se party